**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

| | |
|---|---|
| QUINTIN WALKER a/k/a | ) |
| QUENTIN WALKER, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )       **No. 2:16-cv-2362-STA-egb** |
| | ) |
| LAUDERDALE COUNTY, TENNESSEE, et al., ) |
| | ) |
| **Defendant.** | ) |

_____

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

Before the Court is Defendants Willie Glass, Dixie Duncan, John Neal, Kenneth Geary, Maurio Reed, Tastery Parker, Dalton Lenderman, Gordon Johnson, and Christy Norton's Motion for Summary Judgment (ECF No. 39) filed on March 16, 2018. Plaintiff Quintin Walker has not responded to the Motion, despite two different orders from the Court directing him to do so and cautioning him about the consequences of his failure to respond. For the reasons set forth below, Defendants' Motion is **GRANTED**.

## BACKGROUND

### I. Procedural History

Plaintiff, who is acting *pro se*, filed his initial Complaint on May 25, 2016, alleging claims for the violation of his constitutional rights under 42 U.S.C. § 1983. The Court granted Plaintiff leave to proceed *in forma pauperis* and proceeded to screen the Complaint pursuant to 28 U.S.C. § 1915A(b). Walker alleges that during his pre-trial confinement at the Lauderdale County Jail in Ripley, Tennessee, guards used excessive force against him during a search of the

cell block.  In a screening order entered on March 23, 2017, the Court dismissed Walker's claims against Lauderdale County for failure to state a claim.  But the Court concluded that Walker had stated a plausible excessive force claim against Defendants Willie Glass, Dixie Duncan, Tastery Parker, Gordon Johnson, and John Neal.  The Complaint also plausibly alleged that Defendants Kenneth Geary, Maurio Reed, Dalton Lenderman, and Christy Norton had the opportunity and ability to protect Walker from the excessive force used against him but failed to do so.  The Court ordered the Clerk to issue summons and ordered the U.S. Marshal to serve the summons and Complaint on these Defendants.  The case was transferred to the undersigned for all further proceedings on March 28, 2017.

The Court entered a Rule 16(b) scheduling order (ECF No. 24) on August 17, 2017, setting January 13, 2018, as the deadline for completing all discovery and February 12, 2018, as the deadline for filing dispositive motions.  The Court subsequently extended the discovery deadline to March 2, 2018, and the motions deadline to March 18, 2018.  After Defendants filed their Rule 56 Motion, Walker filed a motion to compel (ECF No. 43) ten days later on March 26, 2018.  The Court denied the motion to compel, finding that Walker's requests for admissions were, in form and substance, interrogatories and that Walker had not shown cause to exceed the number of interrogatories allowed under the Federal Rules of Civil Procedure.

The timing of Walker's motion to compel and the Court's ruling are relevant because Walker has not responded to Defendants' Motion for Summary Judgment.  The Court issued its order denying Walker's motion to compel on April 9, 2018.  Under Local Rule 56.1, Walker's initial deadline to file a response to the Motion for Summary Judgment was April 16, 2018.  When Walker did not respond by that date, the Court entered an order *sua sponte* on April 24, 2018, cautioning Walker about the significance of Defendants' request for summary judgment

2

and directing Walker to respond by May 21, 2018. On May 16, 2018, Walker placed in the mail a motion for a six-week extension of time in which to file his response. Over Defendants' objections to the request, the Court granted the motion but only in part and gave Walker until June 13, 2018, to file his brief. The Court specifically noted that this deadline gave Walker nearly three months from the filing of the Motion for Summary Judgment in which to prepare and file a response. Despite the Court's decision to extend the deadline, first *sua sponte* and then by partially granting Walker's request for extension, Walker has never filed a response or made a request for additional time to respond.

Generally speaking, a non-moving party's "failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis,* 556 F.3d 484, 496 (6th Cir. 2009)). District courts have no obligation to notify non-prisoner *pro se* parties of the requirements of Federal Rule of Civil Procedure 56 or to advise them of the consequences of failing to respond to a summary judgment motion. *McKinnie v. Roadway Exp., Inc.*, 341 F.3d 554, 558 (6th Cir. 2003). But the Sixth Circuit has sent mixed signals on whether prisoner *pro se* litigants are entitled to such guidance from the courts at summary judgment. *United States v. Ninety-Three Firearms*, 330 F.3d 414, 428 (6th Cir. 2003) (citing the apparent inconsistency in Sixth Circuit cases on the subject).

For example, in *Brock v. Hendershott*, 840 F.2d 339 (6th Cir. 1988), the Sixth Circuit adopted the Ninth Circuit rule that non-prisoner *pro se* litigants were not entitled to any "procedural help" in response to a motion for summary judgment. *Brock v. Hendershott*, 840 F.2d 339, 343 (6th Cir. 1988) (citing *Jacobsen v. Filler*, 790 F.2d 1362, 1364 (9th Cir. 1986)). The Court of Appeals followed the Ninth Circuit's reasoning that just as a represented party must

accept the risk of an attorney's mistakes, an unrepresented party must likewise accept the risk of his own errors. *Id.* The Sixth Circuit then noted in what is arguably *dicta* that the Ninth Circuit did not hold prisoner *pro se* litigants to the same standard "since they often have little choice in proceeding on their own behalf." *Id.* (citing *Filler*, 790 F.2d at 1364 n.4). In fact, another panel of the Sixth Circuit later observed that "[t]here is no authority in this Circuit for the proposition that a district court must advise a *pro se* prisoner of his right to file counter-affidavits or other responsive material or that he must be alerted to the fact that his failure to so respond with such material might result in entry of summary judgment against him." *Williams v. Browman*, 981 F.2d 901, 903 (6th Cir. 1992). The panel in *Ninety-Three Firearms* questioned this claim from *Williams*, cited the dicta from *Brock*, and assumed without deciding that prisoner *pro se* litigants are entitled to notice at summary judgment. *Ninety-Three Firearms*, 330 F.3d at 428; *see also Bass v. Wendy's of Downtown, Inc.*, 526 F. App'x 599, 601 (6th Cir. 2013) ("[P]risoner *pro se* litigants are given limited special aid and consideration" at summary judgment.)

The Court need not decide whether Walker is entitled to "procedural help" in the face of Defendants' Motion for Summary Judgment. The Court gave Walker proper notice of the nature of the summary judgment relief requested by Defendants, the need to respond to Defendants' arguments and evidence, and the fact that in the event Walker did not respond, the Court would consider Defendants' request without the benefit of a response from Walker. These admonitions delivered in two separate orders satisfy any requirement that the Court give Walker notice before proceeding to the merits of the Motion for Summary Judgment. For all of these reasons, the Court finds that the Motion for Summary Judgment is ripe for determination.

**B. Undisputed Facts at Summary Judgment**

The Court now considers whether a genuine issue of material fact exists to preclude judgment as a matter of law. In support of their Motion for Summary Judgment, Defendants have asserted that a number of facts are undisputed for purposes of Rule 56. Local Rule 56.1(a) requires a party seeking summary judgment to prepare a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). If the non-moving party fails to address the moving party's statement of fact properly, the Court will "consider the fact undisputed for purposes" of ruling on the Motion. Fed. R. Civ. P. 56(e)(2). This includes where the non-moving party fails to respond at all. Local R. 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.").

The Court finds that the following facts are not in dispute, at least for purposes of the Motion for Summary Judgment. On September 10, 2014, the Lauderdale County Sheriff's Department arrested and charged Walker with multiple offenses, including DUI and vandalism

(Defs.' Statement of Undisputed Fact ¶ 1.)  Walker was booked into the Lauderdale County Jail on or about September 10, 2014.  (*Id*. ¶ 2.)  Walker remained at the jail as a pre-trial detainee until October 9, 2015, when he pled guilty to his DUI charge.  (*Id*. ¶ 3.)  During Walker's pretrial detention, on July 23, 2015, Sergeant Duncan and Sergeant Glass received information that Inmate Chris Hart, who was assigned to the Unit 1 pod of the Lauderdale County Jail, had smuggled drugs into the housing unit, to wit, crystal meth. (*Id*. ¶ 4.)  The Unit 1 pod is a large, open pod that contains thirty-eight bunk beds where inmates sleep.  (*Id*. ¶ 5.)  Walker along with approximately twenty-five other inmates were housed in the Unit 1 pod on July 23, 2015.  (*Id*. ¶ 6.)

Based on the information about Inmate Hart and the suspected presence of drugs in the pod, Sergeant Duncan and Sergeant Glass instructed several officers on duty at the jail to go into the Unit 1 pod and to search Inmate Hart and locate the illegal drugs that they believed Inmate Hart possessed.  (*Id*. ¶ 7.)  Shortly after they walked into the pod, Sergeant Duncan witnessed Inmate Judson Ouzts conspicuously place something down his pants in an apparent attempt to hide something from officers.  (*Id*. ¶ 8.)  Sergeant Duncan instructed Officer Gordon Johnson, Officer Maurio Reed, and Officer Dalton Lenderman to search Inmate Ouzts.  (*Id*.) As Officers Johnson, Reed and Lenderman were frisk searching Inmate Ouzts, Inmate Ouzts began fighting Officers Johnson, Reed, and Lenderman and refused to hand over whatever he was hiding.  (*Id*. ¶ 9.)

As soon as Inmate Ouzts began fighting officers, Walker walked towards the scuffle.  (*Id*. ¶ 10.)  Sergeant Glass immediately approached Walker and instructed him to walk away. (*Id*. ¶ 11.)  Walker initially complied with Sergeant Glass's orders and stood against a wall away from the scuffle.  (*Id*. ¶ 12.)  In attempting to restrain and gain control of Inmate Ouzts, Officer Reed

took Inmate Ouzts to the ground. (*Id*. ¶ 13.) Even then, Inmate Ouzts refused to relinquish what he was hiding and continued to fight officers. (*Id*.)

Although Walker initially complied with Officer Glass's orders and stood back from the scuffle, approximately 30 seconds later Walker suddenly and without warning rushed towards the officers who were attempting to gain control over Inmate Ouzts. (*Id*. ¶ 14.) Walker's actions in rushing the officers led the officers to believe that Walker intended to assault the officers as they attempted to restrain Inmate Ouzts and thwart their efforts to locate what Inmate Ouzts was hiding. (*Id*. ¶ 15.) So Officers Parker, Geary, and Neal immediately grabbed Walker's upper body to prevent him from attacking the officers who were dealing with Inmate Ouzts. (*Id*. ¶ 16.)

Sergeant Duncan proceeded towards Walker to assist officers in restraining Walker and placed her hands on his right arm. (*Id*. ¶ 17.) Walker continued to resist and fought the officers attempting to restrain him and quickly pulled away from Sergeant Duncan. (*Id*.) Walker began fighting Officers Parker, Geary, and Neal and refused their verbal commands to stand down and to place his hands behind his back. (*Id*. ¶ 18.) Sergeant Glass used a handheld Taser twice to Walker's left shoulder as Walker continued to fight officers and refuse verbal commands to stand down and place his hands behind his back. (*Id*. ¶ 19.) As Walker came towards Officer Johnson and other officers, Officer Johnson discharged a one-second burst of pepper spray at Walker. (*Id*. ¶ 20.) Even after being tased and sprayed with pepper spray, Walker continued to refuse to stand down and comply with the officers' orders to voluntarily place his hands behind his back so the officers could restrain him. (*Id*. ¶ 21.)

Officers Parker, Geary, and Neal pulled Walker away from the officers attempting to restrain Inmate Ouzts and moved Walker towards the wall where he had been originally standing. (*Id*. ¶ 22.) Walker continued to fight the officers and began moving back towards

Inmate Ouzts and the officers attempting to restrain Inmate Ouzts. (*Id*. ¶ 23.) Because Walker refused to obey the officers' verbal commands and posed a threat towards the officers in the pod, Officer Parker placed Walker in a headlock and attempted to take him to the ground in an effort to restrain him. (*Id*.) Walker refused to go to the ground and continued to fight Officer Parker and other officers. (*Id*. ¶ 24.) Walker bit Sergeant Parker's left hand, which required medical attention after the incident was over. (*Id*. ¶ 25.) When Walker broke free from Officers Geary and Neal, Officers Lenderman and Watson came to Officer Parker's aid, as he continued to hold Walker in a headlock. (*Id*. ¶ 26.) While Officer Parker continued to hold Walker in a headlock, Officers Lenderman and Watson were finally able to grab Walker's arms and place them behind his back. (*Id*. ¶ 27.) Officer Norton also came to the aid of Officers Parker, Lenderman, and Watson and grabbed handcuffs out of Officer Lenderman's back pouch to attempt to handcuff Walker. (*Id*. ¶ 28.) As Officer Norton was attempting to handcuff Walker, Walker continued to fight officers and pulled his arms away from Officers Norton and Lenderman so that they could not cuff him. (*Id*. ¶ 29.)

Inmate Ouzts eventually maneuvered himself close to the toilets in Unit 1 and threw whatever he was hiding over a half-wall which separated the toilets from the bunk beds. (*Id*. ¶ 30.) Another inmate in the unit quickly ran around the half-wall, grabbed what was tossed, and flushed it down a toilet. (*Id*.) As soon as the hidden item was flushed down the toilet, Inmate Ouzts and Walker became compliant and stopped fighting officers. (*Id*. ¶ 31.) Inmate Ouzts and Walker were then escorted by officers to a court holding cell. (*Id*. ¶ 32.) Walker had no obvious injuries that required medical attention immediately after the incident. (*Id*. ¶ 33.) An officer continued to check on Walker regularly while hew as in the holding cell. (*Id*. ¶ 34.)

Later that night, Walker began complaining that he was in pain. (*Id*. ¶ 35.) As soon as Walker began complaining of pain, Officer Neal contacted the jail nurse who was not on duty at the time and informed her of Walker's complaints. (*Id*. ¶ 36.) The jail nurse instructed Officer Neal to have other officers continue regular checks for an hour to see if Walker's condition improved. (*Id*.) After an hour, Walker continued to complain of pain, so Officer Neal contacted Officer Geary and Sergeant Glass, at which point Officer Geary called for an ambulance. (*Id*. ¶ 37.) Walker received treatment for bruises and pain medication at a local hospital and returned to the jail within a few hours. (*Id*. ¶ 39.)

Each Defendant has submitted individualized statements about their part in the encounter with Walker. Sergeant Duncan denies that she ever physically touched Walker during the incident, other than her brief attempt to pull Walker away when he rushed towards the officers. (*Id*. ¶ 40.) Sergeant Glass admits that he tased Walker twice to his shoulder immediately after Walker charged the officers as they were attempting to gain control of Inmate Ouzts but denies that he ever physically touched Walker. (*Id*. ¶ 41.) Officer Johnson admits that he deployed pepper spray in a brief, one-second burst of spray towards Walker when he charged Officer Johnson and the other officers who were attempting to gain control of Inmate Ouzts but denies that he ever physically touched Walker. (*Id*. ¶ 42.) Officer Neal admits that he physically grabbed Walker's upper body to prevent him from attacking other officers when Plaintiff charged the officers. (*Id*. ¶ 43.) Officer Reed denies that he ever physically touched Walker at any time during the incident and asserts that he was occupied with attempting to restrain Inmate Ouzts throughout the incident. (*Id*. ¶ 44.) Officer Geary did not physically touch Walker at any time during the incident other than his brief attempt to restrain Walker when he rushed towards the officers. (*Id*. ¶ 45.) Officer Lenderman denies that he ever physically touched Walker during

the incident other than holding Walker's hands behind his back when Officer Norton attempted to cuff Walker. (*Id.* ¶ 46.) Officer Norton denies that she ever physically touched Walker during the incident other than her attempt to handcuff Walker in aid of Officer Parker and Officer Lenderman. (*Id.* ¶ 47.) Finally, Officer Parker admits that he held Walker in a headlock to protect other officers but denies that he ever punched Walker. (*Id.* ¶ 48.)

In further support of their statements of fact, Defendants have produced a video recording of the incident, and the video evidence clearly corroborates their view of the facts. The video shows the officers enter into the pod with multiple bunks and approach Inmate Ouzts. The video further shows that Walker, rather than being an innocent bystander, quickly approached the crowd of officers attempting to gain control over Inmate Ouzts and involved himself into a tense standoff. Perhaps most important, the video shows Walker actively resisting the officers as they tried to remove him from the melee. All of this stands in stark contrast to the version of events alleged in Walker's Complaint under penalty of perjury where Walker denied that he did anything to provoke the use of force or that he was resisting in any way during the incident or that he refused to obey orders given by the officers.

Generally, a complaint signed under penalty of perjury "carries the same weight as would an affidavit for the purposes of summary judgment." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (citing *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993)). The Court's role at summary judgment is to view the facts in the light most favorable to the non-moving party and accept as true the non-moving party's version of events. And yet the Sixth Circuit has held that "witness accounts seeking to contradict an unambiguous video recording do not create a triable issue." *Shreve v. Franklin Cnty.*, 743 F.3d 126, 132 (6th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Walker's version of events, in essence that he was caught up in the wrong place at the wrong time and that officers indiscriminately used force against him, is belied by the video recording. None of Walker's allegations shows that a genuine dispute exists about what happened on July 23, 2015, and no reasonable juror could accept his version of events. Therefore, the Court finds the officers' versions of events is undisputed for purposes of summary judgment.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and the "judge may not make credibility determinations or weigh the evidence." *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. These facts must be

more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." *Lord v. Saratoga Cap., Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## ANALYSIS

Defendants seeks judgment as a matter of law on Walker's claims for the violation of his constitutional rights. Defendants first argue that none of the force employed to gain Walker's compliance was excessive or otherwise unreasonable under the circumstances. As such, no reasonable juror could return a verdict in Walker's favor as any of the individual correctional officers. Additionally, Defendants argue that without proof that any of them used excessive force in violation of Walker's constitutional rights, Walker cannot hold any Defendant liable for their alleged failure to intervene on his behalf. Finally, Defendants argue that even if the Court holds that they used excessive force against Walker, each Defendant is entitled to qualified immunity. As the Court has already noted, Walker has never responded to the Motion for Summary Judgment.

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. In order to prevail on such a claim, a section 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right," *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001), but creates a "species of tort liability" for the violation of rights guaranteed in the Constitution itself. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)).

The Supreme Court held in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) that excessive force claims brought by pre-trial detainees must be analyzed under the Fourteenth Amendment's standard of objective reasonableness, rejecting a subjective standard that takes into account a defendant's state of mind. *Id.* at 2472-73. "[O]bjective reasonableness turns on the facts and circumstances of each particular case. *Id.* at 2473 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*; *see also Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). The "reasonableness" inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

motivation." *Id.* at 397 (citations omitted).  The proper application of this standard requires considerations of the following factors:

> the relationship between the need for the use of force and the amount of force used; the extent the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 135 S. Ct. at 2473.  This is not an exhaustive list, but rather an illustration of the "objective circumstances potentially relevant to a determination of excessive force. " *Id.*

The Court holds that Walker has failed to carry his burden as to any of his claims of excessive force against any of the Defendants.  "[W]henever prison officials stand accused of using excessive physical force in violation of the [Constitution], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Davis v. Agosto*, 89 F. App'x 523, 525 (6th Cir. 2004) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)).  In this case the undisputed evidence shows that each Defendant acted reasonably to maintain or restore discipline and security in the housing pod and did not use force against Walker with a malicious intent to harm him.  The officers were present in the housing unit for the legitimate purpose of investigating possible contraband.  Upon the officers' entry into the pod, another inmate Inmate Ouzts began actively resisting the officers.  Walker disobeyed orders to stay back and made a deliberate decision to involve himself in the struggle.  Walker then spent several minutes actively resisting the officers' attempts to put him in handcuffs and remove him from the area of the scuffle with Inmate Ouzts.  Walker became compliant once another inmate disposed of the suspected contraband down a toilet in the pod.  Walker's injuries from the struggle appear to have been relatively minor; he was only treated for

bruises and given pain relief medicine at a local hospital. Based on each of these facts, the Court cannot say that Defendants used excessive force against Walker.

Before applying the law to the specific facts of the case, the Court notes there were actually several discrete forms of force against Walker in this instance: the general physical pushing and grappling, Sergeant Glass's use of a Taser, Officer Johnson's use of pepper spray, and Officer Parker's use of a headlock. For purposes of its Fourteenth Amendment analysis, the Court will first consider the general physical touching that occurred during Walker's struggle with the officers. The Court will then proceed to analyze each particular technique (Taser, pepper spray, and headlock) used by individual officers to bring Walker under control and decide whether each was reasonable under the circumstances. *Hanson v. Madison Cnty. Detention Ctr.*, 736 F. App'x 521, 529 (6th Cir. 2018) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996); and *Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004)).

## I. Physical Touching and Restraint

The first issue presented is whether each Defendant who laid hands on Walker as part of the larger attempt to restrain him acted reasonably and in good faith or whether they used excessive force with the malicious or sadistic intent to harm Walker. The Court holds that they acted in a reasonable, good faith attempt to maintain order and discipline. Officer Parker, Officer Geary, and Officer Neal, the first officers to have physical contact with Walker, acted reasonably when they moved to stop Walker and restrain him after he first left his standing position on the wall and rapidly approached the scrum between officers and Inmate Ouzts.[1] The

---

[1] Sergeant Duncan's decision to assist the officers and her simple act of placing her hand on Walker's shoulder during this initial segment was nothing more than a *de minimis* application of force. The Constitution does not prohibit a *de minimis* level of force in correctional settings. *Wolfish*, 441 U.S. at 539 n.21. "Not every push or shove, even if it may later seem unnecessary

proof shows that Walker had been directly ordered to stay back from the area and told to remain on the wall.  His initial decision to comply with the order demonstrates that he understood the directive; his decision to enter the fray a few seconds later demonstrates that he made a deliberate choice to ignore the order.  Once Walker decided to approach the officers working to restrain Inmate Ouzts, the officers "had no way of knowing what direction matters would take." *Whitley v. Albers,* 475 U.S. 312, 323 (1986).  Officers were already struggling with Inmate Ouzts who had refused to obey a legitimate order.

Faced with Walker's defiance and the possibility of two inmates becoming belligerent in a somewhat crowded housing unit, the officers were entitled to "preserve internal order and discipline." *Hanson*, 736 F. App'x at 532 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).  Walker's decision to disregard a simple and clear directive taken together with the tense situation then unfolding with Inmate Ouzts in an open housing pod with a number of other inmates present made the officers' decision to restrain Walker reasonable under the circumstances.  Therefore, the Court holds that Officer Parker, Officer Geary, and Officer Neal are entitled to judgment as a matter of law on any claim for the use of the force during the initial segment of their struggle with Walker.

For similar reasons, the Court holds that Officer Lenderman, Officer Watson, and Officer Norton, the officers who held Walker's arms in position and tried to get him in handcuffs near the end of the struggle, also acted reasonably and in good faith.  The evidence shows that Lenderman and Watson were the officers who were holding Walker's arms in an attempt to get

---

in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396. Even if it could be said that Sergeant Duncan's act of putting her hand on Walker's shoulder was more than *de minimis*, the Court would still conclude that her attempt to assist the other officers as they acted to keep Walker back and away from Inmate Ouzts was reasonable.

them behind his back long enough to be handcuffed. Not only was Walker actively resisting the officers, but Walker only stopped his physical resistance once another inmate flushed an unknown object (the suspected contraband) down a toilet. As Officer Lenderman and Officer Watson grappled with Walker to get him in handcuffs, Officer Norton was merely attempting to place the cuffs on Walker's wrists. All of these acts are consistent with good faith efforts to restore order, and none evidences a malicious intent to harm Walker. Therefore, Officer Lenderman, Officer Watson, and Officer Norton are entitled to judgment as a matter of law on any claim against them for their individual roles in the tussle with Walker.

## II. Use of a Taser

The second segment of the episode centered on Sergeant Glass's decision to use a Taser after Walker physically resisted the officers' efforts to restrain him and refused to allow the officers to place him in handcuffs. "Active resistance to an officer's command can legitimize an officer's use of a Taser." *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015).[2] In the use of force generally and in the specific context of using a Taser, "active resistance" includes verbal hostility or a deliberate act of defiance, *Hanson*, 736 F. App'x at 531 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534–35 (6th Cir. 2013)), such as a physical refusal to comply. *Goodwin*, 781 F.3d at 326. In this case it is undisputed that Walker was actively resisting the officers at the time Sergeant Glass activated his Taser. The evidence

---

[2] *Goodwin* is part of a line of Sixth Circuit cases involving the use of a Taser to effectuate an arrest, not to restore order or compliance in an institutional setting. *E.g. Hagans v. Franklin Cnty. Sheriff's Office,* 695 F.3d 505 (6th Cir. 2012); *Eldridge v. City of Warren*, 533 F. App'x 529 (6th Cir. 2013); *Foos v. City of Delaware,* 492 F. App'x 582 (6th Cir. 2012). Nevertheless, the Sixth Circuit has applied *Goodwin*'s principles on the reasonable use of a Taser in a recent case where officers used a Taser during the booking process to gain the arrestee's compliance. *Hanson*, 736 F. App'x at 531. The Court, therefore, finds *Goodwin* and cases like it where officers used a Taser in the context of an arrest to be persuasive authority.

shows that Sergeant Glass had given Walker the initial instruction to remain standing back from the scene and against a wall. Walker, though he had at first complied with Sergeant Glass's order, disregarded the instructions and then suddenly moved closer to approach Inmate Ouzts and the other officers. Four officers had already made a reasonable attempt to stop Walker, and he actively resisted their attempt by fighting back. It bears repeating that all of these events transpired in a housing pod with a number of jail officials and unrestrained inmates present and in the open. At the point in time when Sergeant Glass used his Taser, Walker was actively defying an appropriate order to stay back at a safe distance and allow officers to place him in handcuffs. Under the circumstances, Sergeant Glass's use of the Taser twice on Walker's shoulder as part of the effort to bring him under control was reasonable and necessary to maintain order and security in the housing pod. Therefore, the Court concludes that Sergeant Glass is entitled to summary judgment on this claim.

### III. Use of Pepper Spray

The third segment of the episode involved Officer Johnson's use of pepper spray to subdue Walker. Even though there exists only "a very limited class of circumstances when the use of pepper spray is proper," one of them is "where a detainee is unsecured, acting violently, and posing a threat to himself or others." *Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007). The Sixth Circuit has consistently held that "the use of chemical agents against recalcitrant prisoners did not violate the [Constitution]." *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (quoting *Caldwell v. Moore,* 968 F.2d 595, 600 (6th Cir. 1992) (collecting cases)). The proof here shows that Walker was unsecured and continuing actively to resist the efforts of multiple officers to subdue him, even after having been tased twice. The use of the pepper spray presents a somewhat closer question, if only because Sergeant Glass had already

used his Taser two times on Walker. The fact remains that Walker continued to struggle with the officers and that Officer Johnson used only a short, one-second spray of pepper spray. The Court concludes that Officer Johnson's conduct was not unreasonable under the circumstances. Therefore, Officer Johnson is entitled to judgment as a matter of law on this claim.

### IV. Headlock

The final segment of the encounter is Officer Parker's use of a headlock to gain physical control over Walker. The use of a headlock in conjunction with another takedown technique, such as physically slamming a prisoner or arrestee who is in restraints and not actively resisting, can constitute excessive force. *Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) ("[P]erforming a takedown on a detainee who is physically compliant, not a threat, and not attempting to flee 'violate[s] the [Constitution].'"); *Bass v. Robinson*, 167 F.3d 1041, 1046 (6th Cir. 1999) ("[D]espite [plaintiff's] cooperation, Officer Robinson attacked him both verbally and physically[,] . . . put him in a 'headlock[,]' and slammed Plaintiff's head against a tree several times."). By contrast, the use of a headlock or other takedown technique is reasonable where a prisoner or arrestee is not in restraints and is actively resisting an officer. *Standifer v. Lacon*, 587 F. App'x 919, 925 (6th Cir. 2014).

The undisputed proof here shows that Officer Parker put Walker in a headlock and grappled with him but at a time when Walker was not in restraints and was forcefully resisting other officers' attempts to bring him under control and gain his compliance. In fact, Walker "knowingly caused physical harm" to Officer Parker by biting Parker's hand even as Parker held him in the headlock. *Id.* Again, "the issue is not whether the use of force was absolutely necessary in hindsight, but whether the use of force could plausibly have been thought necessary." *Cordell v. McKinney*, 759 F.3d 573, 581 (6th Cir. 2014) (quoting *Griffin v.*

*Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (internal quotation marks omitted)).   Under the totality of the circumstances, Officer Parker's use of the headlock was not an unreasonable application of force.   The Court concludes that Officer Parker is entitled to judgment as a matter of law on the claims against him.   Therefore, Defendants' Motion for Summary Judgment is **GRANTED** on the question of whether any Defendant violated Walker's constitutional rights.

## V.   Failure to Intervene

Having concluded that Walker cannot prove that any Defendant violated his constitutional rights by using excessive force, the Court need not decide whether any Defendant is liable for a failure to intervene.   In order to establish a claim against a prison official for the failure to intervene or protect an inmate from another officer's use of excessive force, the plaintiff must show "that the officer observed or had reason to know that excessive force would be or was being used and that the officer had both the opportunity and the means to prevent the harm from occurring." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 945–46 (6th Cir. 2017) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).   Without proof that an officer used excessive force, Walker cannot prove that any other officer had a duty to prevent harm to Walker.[3]

## VI.   Qualified Immunity

For similar reasons, the Court has no reason to reach the question of whether any Defendant is entitled to qualified immunity.   "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the

---

[3] This includes Officer Reed.   Although Walker alleges that Officer Reed was involved in the altercation, there is no proof at summary judgment that Officer Reed ever made physical contact with Walker.   Therefore, Officer Reed is entitled to judgment as a matter of law as to any claim against him, including a claim that he failed to intervene.

unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Here, Walker has the burden to show that a defendant is not entitled to qualified immunity, which means he must prove in part that the official violated a statutory or constitutional right. *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). In the absence of proof of a constitutional violation, the Court has no cause to decide whether any Defendant is entitled to qualified immunity.

## CONCLUSION

The Court holds that Defendants are entitled to judgment as a matter of law on each of Walker's claims against them. Therefore, Defendants' Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: March 13, 2019.